# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| **SHANELLE JENKINS, as** | § | |
| **surviving spouse, and** | § | |
| **Representative of the Estate of** | § | |
| **ROBERT GERON MILLER** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **OFFICER MICHAEL** | § | |
| **TAHMAHKERA, OFFICER** | § | **CIVIL ACTION NO. 4:23-cv-1207** |
| **JORDAN BEENE, OFFICER** | § | |
| **JASON WHEELER, OFFICER** | § | |
| **E. KAUTZ, OFFICER S.** | § | **JURY TRIAL DEMANDED** |
| **JAMES, OFFICER MICHAEL** | § | |
| **SWAN, OFFICER NICHOLAS** | § | |
| **BERNAL, NURSE BJ** | § | |
| **ODONNELL, NURSE SHARON** | § | |
| **SINGLETON, and SERGEANT** | § | |
| **SHELDON KELSEY** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

Plaintiff SHANELLE JENKINS ("Plaintiff"), by and through her attorneys, brings this action on her behalf, and on behalf of her deceased husband, ROBERT GERON MILLER, for damages and other legal and equitable relief from Defendants OFFICER MICHAEL TAHMAHKERA, OFFICER JORDAN BEENE, OFFICER JASON WHEELER, OFFICER E. KAUTZ, OFFICER S. JAMES, OFFICER MICHAEL SWAN, NURSE BJ ODONNELL,

NURSE SHARON SINGLETON, and SERGEANT SHELDON KELSEY (collectively "Defendants") for violations of rights under the United States Constitution.

## INTRODUCTION

1.      This is an action brought by Plaintiff individually and on behalf of her deceased husband, Robert Geron Miller ("Mr. Miller"), against Defendants for the unlawful killing of Mr. Miller through the improper use of force and the use of chemical weapons against a nonthreatening, subdued individual in restraints. Defendants' actions, under the color of law, were in violation of individual rights under the Fourteenth Amendment of the United States Constitution actionable pursuant to 42 U.S.C § 1983, in violation of Title II of the Americans with Disabilities Act of 1990, and caused Mr. Miller's wrongful death actionable pursuant to 42 U.S.C § 1983.

2.      On or around July 31, 2019, Robert Geron Miller was arrested and brought under the custody of Tarrant County Sherriff's Office on behalf of Tarrant County at the Tarrant County Corrections Center ("Tarrant County Jail" or "the Jail"). Defendants Tahmahkera, Beene, Wheeler, Kautz, James and Kelsey (collectively "Detention Officer Defendants")  assaulted Mr. Miller with excessive force through chemical weapons and violence. Several of the Detention Officer Defendants served as active bystanders to the chemical weapons assault, and chose not to act to prevent it. The assault caused Mr. Miller to suffer unwarranted, unlawful, and excruciating physical and mental anguish, and ultimately caused his death due to a mixed respiratory failure and cardiac arrest.

3.      Following the violent assault of Mr. Miller, Defendant O'Donnell, Defendant Singleton, and Defendant Swan (collectively "Nurse Defendants") were deliberately indifferent to Mr. Miller's need for emergency medical treatment despite repeated requests by Mr. Miller for such services.

4.      Several of the Individual Defendants served as active bystanders to the denial of basic human medical needs and chose not to act to prevent it. As a result of the denial of basic human medial needs, Mr. Miller suffered unwarranted, unlawful, and excruciating physical and mental anguish, and ultimately death due to a mixed respiratory failure and cardiac arrest.

5.      As a result of Defendants' unlawful actions, Plaintiff, individually as the living spouse of Mr. Miller, and as the personal representative of Mr. Miller's estate, is entitled to recovery for damages pursuant to violations of rights under the United States Constitution, including protections against excessive force under the Fourteenth Amendment; protections against the denial of basic human medical needs under the Fourteenth Amendment, failures to act to prevent the deprivation of constitutional rights by bystander state officials, and for wrongful death.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C.A § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C.A §§ 1343(a)(3) and 1343(a)(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; and (iii) 42 U.S.C.A §§ 1983 *et seq*., as amended.

7.      Venue is proper in this Court pursuant to 28 U.S.C.A § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

8.      Shanelle Jenkins is and has been, at all relevant times, a citizen of the United States and is a resident of the State of Texas. Ms. Jenkins was legally married to Robert Geron Miller at the time of his death on August 1, 2019. Ms. Jenkins sues on behalf of herself, as the wrongful death beneficiary of her husband and as the personal representative of the Estate of Mr. Miller.

9.      Sergeant Sheldon Kelsey (Employee #72291) is a supervisory detention officer for Tarrant County, and operates at the Tarrant County Jail. Sgt. Kelsey is sued in his individual capacity. At all relevant times, Sgt. Kelsey was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer supervising and in coordination with other Tarrant County Jail Employees.

10.      Detention Officer Michael Tahmahkera (Employee #58563) is a detention officer for Tarrant County, and operates at the Tarrant County Jail. Detention Officer Tahmakkera is sued in his individual capacity. At all relevant times, Detention Officer Tahmakkera was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

11.      Detention Officer Jordan Beene (Employee #73336) is a detention officer for Tarrant County, and operates at the Tarrant County Jail. Detention Officer Beene is sued in his individual capacity. At all relevant times, Detention Officer Beene was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

12.      Detention Officer Jason Wheeler (Employee #72291)  is a detention officer with for Tarrant County, and operates at the Tarrant County Jail. Detention Officer Wheeler is sued in his individual capacity. At all relevant times, Detention Officer Wheeler was acting under the color

of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

13.    Detention Officer E. Kautz (Employee #72295) is a detention officer for Tarrant County, and operates at the Tarrant County Jail. Detention Officer Kautz is sued in his individual capacity. At all relevant times, Detention Officer Kautz was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

14.    Detention Officer S. James (Employee #72291) is a detention officer for Tarrant County, and operates at the Tarrant County Jail. Detention Officer James is sued in his individual capacity. At all relevant times, Detention Officer James was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

15.    Registered Nurse BJ O'Donnell (Employee #208257) is a registered official nurse under the Texas Occupations Code for Health Profession employed by Tarrant County, and operates at the Tarrant County Jail. Nurse O'Donnell is sued in their individual capacity. At all relevant times, Nurse O'Donnell was acting under the color of law as a Tarrant County Sheriff's Office registered nurse in coordination with other Tarrant County Jail Employees.

16.    Registered Nurse Sharon Singleton is a registered official nurse within under the Texas Occupations Code for Health Profession employed by Tarrant County, and operates at the Tarrant County Jail. Nurse Singleton is sued in her individual. At all relevant times, Nurse Singleton was acting under the color of law as a Tarrant County Sheriff's Office registered nurse in coordination with other Tarrant County Jail Employees.

Detention Officer Michael Swan (Employee #74815) is a detention officer for Tarrant County, and operates at the Tarrant County Jail. Detention Officer James is sued in his individual. At all relevant times, Detention Officer James was acting under the color of law as a Tarrant County Sheriff's Office Detention Officer in coordination with other Tarrant County Jail Employees.

## STATEMENT OF FACTS

### A.  Mr. Miller's Arrest and Excessive Charge

17.     On or around July 31, 2019, at approximately 9:54 AM, Deputy Marshal Ford of the City of Fort Worth was dispatched to 900 E 12th Street in Fort Worth, Texas. Deputy Marshal Ford was called to assist Fort Worth Police Department ("FWPD") Officers Atkins and Johns responding to a "homeless" call. Deputy Marshal Ford arrived on the scene and met with Officer Johns, who stated that he had a person, Mr. Miller, with eight local warrants for his arrest and needed to have the Mr. Miller transported to jail.

18.     Prior to Deputy Marshal Ford's arrival, at or around 9:55 AM, Officer Atkins contacted the Fort Worth Municipal Court and notified the court of FWPD's custody of Mr. Miller due to the unpaid fines. A minute later, at or around 9:56 AM, Fort Worth Magistrate Judge C. Tyler Atkinson confirmed the warrants and submitted an order of commitment for Mr. Miller. Magistrate Judge Atkinson incorrectly wrote Mr. Miller's name in the space for the criminal charge information, and did not indicate a specific charge. Magistrate Judge Atkinson further "commanded" the FWPD Officers to take Mr. Miller to jail till he posted a $300 bond or till the following morning on August 1, 2019.

19.     Mr. Miller's commitment order was for citations he had received because he was unhoused at the time. Mr. Miller had been specifically charged with ten (10) citations. The citations

included **(i)** five citations of "Soliciting Contribution,"[1] **(ii)** three citations for "Aggressive Panhandling,"[2] **(iii)** one citation for public intoxication, and **(iv)** one citation for "Don't Walk."[3] Upon information and belief, Mr. Miller was unable to pay the $4,826.30 in fines he received from these solicitations due to his unhoused status and being unable to find employment. As a result, the warrants and commitment order were for his inability to pay the fines. Upon information and belief, the warrants and citations contributed to Mr. Miller's unhoused status.

20.     Upon information and belief, Deputy Marshal Ford did not conduct any evaluation into whether Mr. Miller needed help due to his living condition. Nor did Deputy Marshal Ford appear to place any weight into the incredibly minor nature of Mr. Miller's warrants. Instead, Deputy Marshal Ford immediately told Mr. Miller he was under arrest and, upon information and belief, placed him in handcuffs.

21.     During the arrest, Mr. Miller asked to finish picking up his belongings at his camp site before Deputy Marshal Ford took him to jail. Deputy Marshal Ford ignored the request and shortly afterwards physically grabbed Mr. Miller with Officer Atkins of the FWPD. The law enforcement officers then carried Mr. Miller to Deputy Marshal Ford's patrol car. Mr. Miller then allegedly kicked the patrol car door in an agitated state.

22.     Mr. Miller's response was unsurprising because Mr. Miller suffered from mental health disabilities; severe Post-Traumatic Stress Disorder ("PTSD") with flashbacks to previous negative altercations with law enforcement that resulted in jail time. Under Article 16.23 of Texas Code of Criminal Procedure, Deputy Marshal Ford was required to divert Mr. Miller an

---

[1] *See* Fort Work, TX Code of Ordinances § 30-16 (City of Fort Worth anti-soliciting statute).
[2] *See id.*
[3] *See id.* at § 22-283 (crossing at other than crosswalks).

appropriate and available treatment center upon recognizing a mental health crisis for misdemeanor offenses.[4]

23.    Upon information and belief, Deputy Marshal Ford did not conduct any background check to determine if Mr. Miller needed special care or assistance. Instead, Deputy Marshal Ford ignored the legal requirements of the law and maliciously charged Mr. Miller with Criminal Mischief for kicking the patrol car door.

24.    The severity of a Criminal Mischief charge depends on the value of the damages, as damages between **$750 and $2,500** are a Class (A) misdemeanor.[5] Otherwise the charge can be as low as a Class C misdemeanor.[6] Deputy Marshal Ford had another Officer, Sergeant John Rablee of the FWPD, take photos of the patrol car to get damages estimates to determine the criminal charge.

25.    Deputy Marshal Ford stated that Sgt. Rablee contacted the City of Fort Worth's Body Shop to get a damage estimate, and received a damage estimate valued of **$751**. Deputy Marshal Ford signed an affidavit attesting that he had good reason to believe that Mr. Miller committed a Class (A) Criminal Mischief Offense. Following the arrest, Deputy Marshal Ford took Mr. Miller to a private prison compound that contracts with the City of Fort Worth, La Salle Corrections.

26.    At or around 11:48 AM, Magistrate Judge Atkinson used the above events and the affidavit to sign a probable cause determination and commitment order.

---

[4] *See* Tex. Crim. Code. Art. 16.23.
[5] *See* Tex. Pen. Code § 28.03(b).
[6] *See id.* at § 28.03(b).

27.    The order directed Tarrant County, through the Tarrant County Sheriff's Office, to take custody of Mr. Miller for the Class (A) misdemeanor, pending a future arraignment. As a result, Mr. Miller was ordered to be transferred to the Tarrant County Jail.

28.    Mr. Miller was then relocated to the Tarrant County Jail at or around 2:02 PM and placed in the custody of Tarrant County.

29.    Before Mr. Miller was transferred to the Tarrant County Jail, he was recorded as sitting, standing, walking, laying down, and using the restroom without any health issues or concerns.

### B.  The Transfer to Tarrant County Jail under the Custody of Tarrant County

30.    Upon arrival at the Tarrant County Jail, Mr. Miller went through the booking process. It includes screening for suicidal ideations and for medical, mental, or developmental impairments. The screening occurred at or around 2:05 PM. Defendant Kelsey conducted the screening questionnaire.

31.    Defendant Kelsey and Defendant Wheeler did not observe Mr. Miller display any violence or threatening behavior.

32.    As part of the questionnaire, Defendant Kelsey confirmed Mr. Miller suffered from mental health disabilities resulting from severe PTSD with flashbacks.

33.    Upon information and belief, none of the Detention Officer Defendants present factored in Mr. Miller's disability towards their treatment of Mr. Miller. Instead, Mr. Miller was commented as contemptuous and did not receive any considerations for his mental illness.

34.    Defendant Tahmahkera, Defendant Beene, and Defendant Wheeler specifically classified Mr. Miller as "verbally disruptive" or "verbally combative," but did not identify any physically threatening actions at this time.

35.    Nor was Mr. Miller objectively physically threatening or an immediate threat as he was only five-foot six inches (5'6") and 150 lbs. Mr. Miller alleged "verbal combativeness" presented little to no security problem, active resistance, or physical threat.

36.    Following the questionnaire, at or around 2:15 PM, Mr. Miller was taken to the "change out room" to be changed into a jail uniform by Defendant Tahmahkera, Defendant Beene, and Defendant Kelsey. During this time, Mr. Miller had his hands firmly handcuffed behind his back.

**C. <u>The Unlawful Violent Assault of Mr. Miller</u>**

37.    Immediately after entering the change out room, despite the presence of the three Detention Officer Defendants and Mr. Miller's handcuff restraints, Defendant Tahmahkera chose to slam Mr. Miller face down onto the ground. There was no objective basis behind Defendant Tahmahkera's drastic escalation in force because Mr. Miller took no aggressive action indicating he was an immediate threat. Nor did Mr. Miller express any active resistance. Notably, Defendant Beene stated that Mr. Miller was slammed on the ground only "due to his behavior."

38.    It was unreasonable and excessive for Defendant Tahmahkera to slam Mr. Miller to the ground face first while his hands were handcuffed behind his back. It was objectively clear that Defendant Tahmahkera's use of force would cause serious bodily injuries because Mr. Miller was unable to break his fall with his hands while they were handcuffed behind his back.

39.    Defendant Tahmahkera's excessive and unreasonable use of force caused Mr. Miller to sustain head injuries. Upon information and belief, the impact also dislodged one of Mr.

Miller's teeth, the right upper molar. The three Detention Officer Defendants present then physically restrained Mr. Miller down on the ground to place a uniform on Mr. Miller.

40.     Defendant Wheeler then entered the room place to place leg restraints on Mr. Miller. Defendant Wheeler proceeded to aid the other Detention Officer Defendants to continue physically retraining Mr. Miller face down on the ground. Upon information and belief, at least one of the Detention Officers was holding Mr. Miller down by placing pressure on his neck through a knee or by an open hand.

41.     Despite four of the Detention Officer Defendants physically restraining Mr. Miller face down on the ground and Mr. Miller's arms handcuffed behind his back, Defendant escalated his use of force by firing pepper spray at Mr. Miller's face at close range. Defendant Tahmahkera justified the use of force because Mr. Miller allegedly refused to comply with orders. However, Mr. Miller was unable to "refuse to comply with orders" as he was physically restrained.

42.     Upon information and belief, Mr. Miller could not have moved at this time as he remained in handcuffs; was being held down on the ground by the other Detention Officer Defendants present; and likely had force applied to his neck. There was no objective need for the escalation in the use of force through the chemical weapon. Upon information and belief, there was no attempt to use less force, no legitimate security problem at issue, and zero immediate threat to the Detention Officers Defendants present.

43.     The chemical weapon immediately affected Mr. Miller, and caused instant blindness from involuntary closing of his eyes, extreme pain, and intense burning/inflammation of the lungs and throat.[7] As Mr. Miller experienced this devastating pain, he continued to present zero threat to the four Detention Officer Defendants present.

---

[7] *See* National Collaborating Centre for Environmental Health, *Pepper spray in the indoor environment and in the vicinity of food products and preparation surfaces*, NCCEH (Aug. 2010)

44.     During the chemical assault, Defendant Wheeler secured leg irons on Mr. Miller's legs thereby further constricting Mr. Miller's movements. At this point, Mr. Miller was locked into hand and leg restraints; and was physically restrained by the Detention Officer Defendants with likely use of force applied to Mr. Miller's neck.

### D.  The Abusive Escalation in the Use of Force Against Mr. Miller

45.     Despite all these control mechanisms, Defendant Kelsey fired a second round of pepper spray at Mr. Miller's face at an extremely close range. Defendant Kelsey's additional use of the chemical weapon occurred while Mr. Miller was in hand and leg restraints, physical restrained by at least three other Detention Officer Defendants present, and likely had force applied to his neck.

46.     Defendant Kelsey justified his use of the chemical weapon as necessary to strip Mr. Miller naked to place him in a uniform. Defendant Kelsey's use of force did not address a severe security problem, threatening behavior, or to control serious active resistance. It was objectively clear that Mr. Miller presented no threat to the security of the Tarrant County Jail at this time, and the second spray was in excessive of any legitimate purpose besides subjecting Mr. Miller to tortious pain.

47.     The additional spray exponentially increased the effects of the debilitating effects and pain of the pepper spray due to the increase in exposure and increased concentration of the chemical. Upon information and belief, Mr. Miller became extremely disoriented due to the

---

https://ncceh.ca/documents/field-inquiry/pepper-spray-indoor-environment-and-vicinity-food-products#:~:text=Eyes%3A%20Stinging%2C%20burning%2C%20tearing,wheeze%20and%20shortness%20of%20breath; *see also* C. Gregory Smith, Woodhall Stopford, *Health Hazards of Pepper Spray*, NC MEDICAL JOURNAL (Aug. 17, 2000) [http://web.archive.org/web/20000817004624/http://www.ncmedicaljournal.com/Smith-OK.htm].

blindness, extreme pain, and other harmful effects. Defendant Kelsey ignored Mr. Miller's extreme pain and disorientation.

48.     None of the Detention Officer Defendants' actions were taken with any regard to the objective facts known to the Detention Officer Defendants, specifically Mr. Miller's known severe PTSD and the hand and leg restraints.

49.     Despite the objective facts known to the Detention Officer Defendants, Defendant Kelsey fired a third round of pepper spray at Mr. Miller's face at close range. Defendant Kelsey use of force occurred while Mr. Miller remained physically restrained to the ground, in full-body restraints, in extreme pain, and likely had force applied to his neck. Defendant Kelsey's use of the chemical weapon caused extreme pain and suffering that bordered on torture.[8] Upon information and belief, Defendant Kelsey's unlawful use of force was readily apparent and observable to all the Detention Officer Defendants present.

50.     Immediately after the third chemical assault of Mr. Miller, Defendant James entered the room and observed Mr. Miller on the ground, physically restrained by the four Detention Officers, and in full-body metal restraints. At this time, upon information and belief, Mr. Miller had inhaled a significant amount of pepper spray due to the multiple chemical assaults fired at close-range at Mr. Miller's face.

51.     Defendant Krautz arrived shortly afterwards and aided the five other Detention Officer Defendants  in physically restraining Mr. Miller face down to the floor.

52.     The abusive assault of Mr. Miller finally ended five minutes after it started; at or around 2:20 PM.

---

[8] Amnesty International, <u>Chemical Irritants in Law Enforcement</u>, at p. 10, (2021) ("Pepper Spray should never be used on a person who is already restrained or otherwise under control, as this would amount to torture or other ill-treatment.")

53.    The Detention Officer Defendants actions during the assault were in concert to physically assault and to attack Mr. Miller three times with pepper spray while he was physically unable to move because of the multiple restraints. Any of the bystander Detention Officer Defendants present could have intervened at any point to prevent the unlawful and excessive use of force by their coworkers, yet none of them took any action to stop the unlawful behavior. Nor did any of the Detention Officers alter their behavior because of Mr. Miller's mental disability.

E.  **The Deadly Effects of Oleoresin Capsicum ("OC") Chemical Weapons**

54.    The Detention Officer Defendants' violent assault on Mr. Miller utilized a chemical combination that includes the chemical, Oleoresin Capsicum ("OC"), to affect the human body. OC alters the neurophysiology of sensory neurons by inducing the release of chemicals in the neurons, thereby altering nerve function to cause significant inflammation in the body and amplify allergic sensitivities.[9] In short, all the science behind OC's effects simply mean that it is intended and operates to cause significant pain.[10]

55.    The use of OC chemical weapons or pepper spray in law enforcement began with a favorable 1989 FBI report that provided anecdotal reports of their safety and efficacy as a "less than lethal" force alternative for law enforcement and corrections agencies.[11] However, in 1995, an author of the report was found to have received cash bribes from a leading manufacturer of OC chemical weapons.[12] But, at that point, OC chemical weapons had already became a common tool of law enforcement.

---

[9] *See* C. Gregory Smith & Woodhall Stopford, *Health Hazards of Pepper Spray*, NC MEDICAL JOURNAL (Aug. 17, 2000).
[10]  *See* Deborah Blum, *About Pepper Spray*, SCIENTIFIC AMERICAN (Nov. 21, 2011) https://blogs.scientificamerican.com/guest-blog/about-pepper-spray/
[11] *See* C. Gregory Smith & Woodhall Stopford, *Health Hazards of Pepper Spray*, NC MEDICAL JOURNAL (Aug. 17, 2000).
[12] *See id.*

56.     The widespread usage overlooks the serious health effects behind OC chemical weapons such as bronchospasm, respiratory arrest, pulmonary edema, hypertensive crisis, hypothermia, serious respiratory effects, permanent lung damage, cardiovascular effects, heart attacks, and permanent damage to the sensory nervous system.[13] A study of human exposures to OC chemical weapons found that there was a 1 in 15 risk for severe adverse health effects.[14]

57.     Researchers have also found that OC chemicals induces "cardiorespiratory dysfunction, heart and lung dysfunction, due to changes in blood pressure.[15] The research also noted that pain and anxiety induced by OC chemical weapons can have harsh impacts on the heart, with significant implications for individuals with pre-existing disease.[16]

58.     Another study, published in the Journal of Correctional Health Care intended for Jail Facilities, concluded:

> [S]tudies of the effects of [OC] on human physiology, anecdotal experience with field use of pepperspray, and controlled exposure of correctional officers in training have shown adverse effects on the lungs, larynx, middle airway, protective reflexes, and skin. Behavioral and mental health effects also may occur if pepper spray is used abusively. Additional risks have been suggested by animal studies. The article recommends that use of pepperspray be restricted in order to prevent serious injuries.[17]

59.     The likelihood of death by OC Chemical weapons is also greatly increased by positional and physical restraints, such as physical pressure applied on an individual while face down or full body restraints.[18] Restraints in combination with OC chemical weapons have been

---

[13] See id; see also Vol. 1, Markita Broadstock, What is the Safety of "pepper spray" Use by Law Enforcement of Mental Health Service Staff, NEW ZEALAND HEALTH TECHNOLOGY ASSESSMENT SERIES, DEPARTMENT OF PUBLIC HEALTH AND GENERAL PRACTICE, at p. 12 (Sept. 2002).

[14] See Thomas Kearney, Patricia Hiatt, Elisabeth Birdsall, & Craig Smollin, Pepper Spray Injury Severity: Ten-year Case Experience of a Poison Control System, PREHOSP EMERG CARE. (Mar. 26, 2014).

[15] See Leah Pinney, Pepper Spray in the Texas Youth Commission: Research Review and Policy Recommendations, TEXAS CRIMINAL JUSTICE INITIATIVE, at p. 4 (Nov. 2007).

[16] See id.

[17] See Vol. 4, M.D. Cohen, Human Health Effects of Pepperspray – a Review of the Literature and Commentary, JOURNAL OF CORRECTIONAL CARE (1997).

[18] Leah Pinney, Pepper Spray in the Texas Youth Commission: Research Review and Policy Recommendations, TEXAS CRIMINAL JUSTICE INITIATIVE, at p. 4.

associated with several deaths as the combination severely strains an individual's ability to breathe.[19]

60.    Inhalation of OC chemical spray can also cause shortness of breath and difficulties breathing from bronchoconstriction (the tightening of the muscles that line the airways in the lungs).[20] The effects can progress into severe respiratory health effects, including respiratory arrest (the inability to breathe at all).[21] Effects further include rapid spikes in blood pressure, thereby increasing the risk of stroke or heart attack.[22]

61.    OC chemical weapons are unregulated in the United States. The lack of regulation allows OC chemical weapons to include toxic chemicals, including organic solvents, halogenated hydrocarbons, and propellants such as freon, tetrachloroethylene, and methylene chloride.[23] These ingredients can exacerbate the harmful impacts of a chemical assault by increasing the quantity of pepper spray, and exacerbate the negative health consequences of OC chemical weapons.[24]

62.    The inhalation of these unregulated chemicals in high doses can cause extreme health effects, including cardiac, respiratory, and neurologic effects, including arrhythmias and sudden death.[25]

63.    Upon information and belief, the Detention Officer Defendants' close-range firing of their chemical weapons without warning, in close proximity to Mr. Miller's mouth while in a confined space, caused Mr. Miller to inhale the OC chemical spray.

---

[19] *See id.*
[20] National Collaborating Centre for Environmental Health, *Pepper spray in the indoor environment and in the vicinity of food products and preparation surfaces*, NCCEH (Aug. 2010).
[21] *See id.*
[22] C. Gregory Smith & Woodhall Stopford, *Health Hazards of Pepper Spray*, NC MEDICAL JOURNAL (Aug. 17, 2000).
[23] *See id.*
[24] *See id.*
[25] *See id.*

64.    Additionally, multiple OC chemical weapon sprays, as Mr. Miller experienced, are associated with more serious health risks because the severity of symptoms depends on concentration of OC chemicals, duration of exposure, and proximity to the firing.[26] Researchers have found that the physical effects of OC chemical weapons are more severe when exposed to a large percentage of OC, or when sprayed with three one-second bursts.[27]

65.    The American Civil Liberties Union (ACLU) was able to acquire an internal memorandum produced by the largest supplier of OC chemical weapons to California police that concluded that stated any use OC on a subject should be limited to a single burst not more than one second otherwise there were likely safety concerns.[28]

66.    The established dangers of OC chemical weapons indicate that the Detention Officer Defendants' use of force through OC chemical weapons created significant risk for Mr. Miller, especially due to **(i)** Mr. Miller's inhalation of OC chemical spray, **(ii)** the close proximity of firing to Mr. Miller's face, **(iii)** the extended duration of exposure to OC chemical spray across three individual firings, and **(iv)** the physical and positional restraints forced on Mr. Miller.

67.    All these factors combined created a significant likelihood of serious respiratory effects or cardiovascular effects; and, thus, created excessive risks in comparison to the objective facts at the time of the assault on Mr. Miller. Therefore, the use of OC chemicals weapons unreasonably escalated the amount of force used against Mr. Miller, and more likely than not caused his eventual death.

---

[26] *See* National Collaborating Centre for Environmental Health, *Pepper spray in the indoor environment and in the vicinity of food products and preparation surfaces*, NCCEH (Aug. 2010).

[27] Lydia Denise Adkins, Oleoresin Capsicum: An Analysis of the Implementation of Pepper Spray into the Law Enforcement Use of Force Continuum in a Selected Police Department, EAST TENNESSEE STATE UNIVERSITY – SCHOOL OF GRADUATE STUDIES, at p. 49-50 (Aug. 2003).

[28] *See* Judy Stone, *Molecules to Medicine: Should Pepper Spray be put on (Clinical) Trial?*, SCIENTIFIC AMERICAN (Nov. 23, 2011) https://blogs.scientificamerican.com/guest-blog/molecules-to-medicine-should-pepper-spray-be-put-on-clinical-trial/.

**F.** **The Deliberate Indifference to Mr. Miller's Emergency Medical Needs**

68.     Following the violent and dangerous assault of Mr. Miller, the six Detention Officer Defendants carried Mr. Miller to the female change out room shower to be "decontaminated." The decontamination process involved the Detention Officer Defendants holding Mr. Miller's face under a shower head running cold water.

69.     It did not involve any use of products intended to immediately treat pepper spray or its effects. The Detention Officer Defendants further failed to take Mr. Miller to be brought outside or to a well-ventilated area.[29] These recommended decontamination procedures aid in reducing the deadly risks of exposure to chemical weapons.[30]

70.     Upon information and belief, the Detention Officer Defendants did not follow recognized decontamination procedures due to deficient policies established by the Tarrant County Sheriff.

71.     After Mr. Miller was doused with cold water for ten minutes, Defendant O'Donnell, a registered nurse ("RN"), conducted a brief medical evaluation based upon the use of the chemical weapons. Mr. Miller reported that the Detention Officer Defendants violent assault caused him (i) pain to his right knee, (ii) a headache, and (iii) **chest pain combined with shortness of breath from the OC chemical weapon**.

72.     Symptoms of shortness of breath combined with chest pain are recognized among health professionals as an immediate emergency medical situation due to indications of cardiac

---

[29] National Collaborating Centre for Environmental Health, *Pepper spray in the indoor environment and in the vicinity of food products and preparation surfaces*, NCCEH (Aug. 2010).
[30] *See id.*

arrest or respiratory failure.[31] Mr. Miller explicitly stated that such medical issues were from the use of the OC chemical weapons.

73.    Mr. Miller's experiences of such symptoms minutes after his chemical assault indicated that he needed to receive emergency medical services.

74.    At this point, all the present Individual Defendants had actual knowledge of Mr. Miller's serious medical complaints and his mental disabilities. In addition, the present Individual Defendants had actual knowledge of Mr. Miller's assault, including the excessive use of force through deadly chemical weapons while Mr. Miller was restrained, and its relation to Mr. Miller's medical complaints.

75.    Based upon this knowledge, Defendant O'Donnell should have immediately responded and provided Mr. Miller emergency medical treatment in order to avoid any serious health complications or consequences.

76.    However, Defendant O'Donnell took no such action. Defendant O'Donnell proceeded to dismiss Mr. Miller's shortness of breath/chest pain because Mr. Miller was able to speak.

77.    Care providers are trained to recognize early signs of impairments to breathing and circulation, such as increased respiratory rate, shortness of breath, or using accessory muscles to breathe.[32] "Waiting until a person loses the ability to speak may be too late to prevent catastrophic [heart and lung] collapse."[33] Defendant O'Donnell's basis for deliberately denying Mr. Miller

---

[31] *See* National Health Services – United Kingdom, *Shortness of Breath*, NHS (Oct. 20, 2020) https://www.nhs.uk/conditions/shortness-of-breath/.

[32] Vol. 173, Anicia C. Law MD. MS., Gary E. Weissman M.D. M.S.H.P., & Theordore J. Iwashyna M.D. P.H.D., <u>A Dangerous Myth: Does Speaking Imply Breathing</u>, AMERICAN COLLEGE OF PHYSICIANS: ANNALS OF INTERNAL MEDICINE, at p. 754-55 (Nov. 3, 2020).

[33] *See id.*

emergency medical attention was based on the same myths the Officers who murdered George
Floyd relied on to deliberately ignore his expression of "I can't breathe."[34]

78.     Upon information and belief, Defendant O'Donnell deliberately chose to deny Mr.
Miller basic human medical care and/or disregarded the significant medical dangers/risks that
could result from shortness of breath/chest pain.

79.     Defendant O'Donnell further alleges that Mr. Miller could not be treated because
he was a "safety risk." However, Mr. Miller did not present any safety risk as he was being carried
by five of the Detention Officer Defendants and remained in full body restraints. The Detention
Officer Defendants were responsible for indicating Mr. Miller was unreasonably a "safety risk."

80.     The present Individual Defendants deliberately and wantonly ignored the
emergency medical needs of Mr. Miller by refusing care on any legitimately lawful basis.

81.     Following such actions, the Detention Officer Defendants chose to force Mr. Miller
into a red jail uniform. The six (6) Detention Officer Defendants then forcibly carried Mr. Miller
throughout the rest of the initial intake process, and deliberately ignored Mr. Miller's continued
requests for medical attention.

82.     The initial intake process ended at or around 2:37 PM. Mr. Miller remained in full
body restraints throughout the entire process, thereby exacerbating any breathing issues or medical
concerns.

83.     Mr. Miller was subsequently taken by the Detention Officer Defendants, excluding
Defendant Beene, to a standard initial intake health screening at or around 2:41 PM. The initial

---

[34]  Leila Navidi, *Medical Experts: Floyd's Speech didn't mean he could Breathe*, STAR TRIBUNE VIA THE
ASSOCIATED PRESS (July 9, 2020) https://www.mprnews.org/story/2020/07/09/medical-experts-floyds-
speech-didnt-mean-he-could-breathe.

intake screening would have occurred regardless of the violent assault of Mr. Miller and his continued requests for medical attention.

84.     Defendant Singleton, a RN, conducted the standard initial health screening in front of the Detention Officer Defendants present. During the screening, Mr. Miller struggled to respond to questions and instead repeated "**I need water, I have asthma, I can't breathe**."

85.     At this point, the present Individual Defendants gained actual knowledge that Mr. Miller was asthmatic, or at least had substantial reason to believe that Mr. Miller was asthmatic.

86.     Individuals with asthma and other respiratory comprising conditions are especially vulnerable to significant difficulties with breathing after being exposed to the effects of OC chemical weapons.[35] Further, the effects of OC chemical weapons are compounded by asthma or other conditions that diminish breathing capacity.[36]

87.     Asthmatics and individuals with similar conditions should be provided immediate emergency medical attention or observation because OC chemical weapons can cause life-threatening respiratory collapse.[37] In fact, OC chemical weapon assaults have been directly involved in numerous deaths of asthmatic people in custody.[38]

88.     Mr. Miller should have been immediately provided emergency medical attention due to risks of respiratory collapse with asthma and exposure to OC chemical weapons. Mr. Miller's repeated statement of "I can't breathe" made it abundantly obvious that Mr. Miller was

---

[35] Leah Pinney, <u>Pepper Spray in the Texas Youth Commission: Research Review and Policy Recommendations</u>, TEXAS CRIMINAL JUSTICE INITIATIVE, at p. 4.

[36] *See id.*

[37] Vol. 16, H. Cil Z.A. Atilgan, Y. Islamoglu, E.O. Tekbas, & Z. Dostbil, <u>Is the Pepper Spray a Triggering Factor in Myocardial Infarction? A Case Report</u>, EUROPEAN REVIEW FOR MEDICAL AND PHARMACOLOGICAL SCIENCES, at p. 75 (2012).

[38] *See* American Civil Liberties Union of Southern California, *Pepper spray update: more fatalities, more questions*, ACLU (1995); *see also* Edwards, S., Granfield, J., & Onnen, J., *Evaluation of pepper spray*, NATIONAL INSTITUTE OF JUSTICE (1997); Vol. 16, Steffee, C. H., Lantz, P. E., Flannagan, L. M., Thompson, R. L., & Jason D.R., <u>Oleoresin Capsicum (pepper) spray and In-Custody Deaths</u>, AMERICAN JOURNAL OF FORENSIC MEDICINE & PATHOLOGY, at 185-92 (1995).

already in the throes of respiratory collapse and was subject to an incredibly high likelihood of death without medical intervention or emergency treatment.

89.     Defendant Singleton should have provided immediate emergency medical treatment or intervention, but Defendant Singleton took no such action.

90.     Upon information and belief, Defendant Singleton deliberately and wantonly ignored Mr. Miller's clear inability to breathe and his physical disability of asthma, and denied taking direction action to save Mr. Miller's life.

91.     Defendant Kelsey was the only person to respond to Mr. Miller's repeated and desperate attempts to receive medical attention for his respiratory collapse. However, Defendant Kelsey's response was not to provide Mr. Miller medical attention. Instead, Defendant Kelsey aimed another chemical weapon, a pepper-gel gun, at Mr. Miller to force him to answer the questions rather than speaking about his inability to breath.

92.     Defendant Kelsey's threats of further force displayed the present Individual Defendants' deliberate actions to ignore Mr. Miller's needs at that moment; thereby denying and delaying him immediate life-saving medical attention to Mr. Miller which resulted in substantial harm.

93.     Ultimately, the medical responses of the Nurse Defendants were a clear and deliberate departure from Texas Law and Texas Board of Nursing ("Texas BoN") standards. Registered nurses are required to know and follow such standards in their practice of nursing, or risk losing their license.

94.     Under TEX. ADMIN. CODE § 217.11(3)(a), the Nurse Defendants were legally required to pass the NCLEX-RN in order to become a RN. Under the NCLEX-RN, a RN must be

able to demonstrate an ability to recognize emergency medical situations, perform emergency care procedures, and notify primary care doctors or other medical staff about medical emergencies.[39]

95.     As part of an emergency medical response, the NCLEX-RN tests cardiovascular and respiratory medical emergencies, such as inhalation lung injuries.[40] Therefore, the Nurse Defendants had actual knowledge to recognize cardiovascular and respiratory emergencies involving the inhalation of toxic chemicals; and knowledge of the need take medical action towards such emergencies.

96.     In addition, Texas BoN Position Statement 15.14 establishes that a registered nurse must possess the knowledge, skills, and abilities to recognize life-threatening health conditions, such as cardiac arrest, respiratory failure, or an asthma attack.[41] Texas BoN further establishes that a registered nurse has a <u>duty</u> to respond with care in such circumstances.[42]

97.     The NCLEX-RN and Texas BoN Position Statement 15.14 indicate that the Nurse Defendants had actual knowledge to recognize cardiovascular and respiratory emergencies involving the inhalation of toxic chemicals; and then the actual knowledge of the need to take medical action towards such emergencies.

98.     Therefore, the Nurse Defendants were aware of the significant likelihood that Mr. Miller was going to die without emergency medical treatment based on Mr. Miller's medical complaints, his medical conditions, and the context of his breathing incapacity, specifically the exposure to high concentrations of chemicals that create significant risks associated with respiratory or cardiac failure.

---

[39] Registered Nursing.org Staff Writers, *Medical Emergencies: NCLEX-RN*, REGISTEREDNURSING.ORG (May 3, 2022) https://www.registerednursing.org/nclex/medical-emergencies/.
[40] *See id.*
[41] TEXAS BOARD OF NURSING, 15.14 DUTY OF A NURSE IN ANY PRACTICE SETTING (Adp. 2005, Amend. 2018).
[42] *See id.*

99.     The Nurse Defendants then wantonly ignored or delayed treatment for Mr. Miller's serious medical concerns; thereby causing substantial harm and likely death.

100.    Texas BoN Position Statement 15.6 and TEX. ADMIN CODE § 217.11 also establish that a registered nurse must promote a safe environment for clients and other, and that standard should supersede a facility's policy.[43]

101.    Texas BoN Position Statement 15.6 establishes that patients under the care of a Texas nurse are vulnerable by virtue of the dependent nature and unequal power base of the nurse-patient relationship.[44] Patients are especially vulnerable if they are mentally ill, immobilized, or physically restrained.[45] Violating this duty can deprive a registered nurse of their nursing license.

102.    Therefore, the Nurse Defendants had actual knowledge of the overwhelming need to provide emergency medical attention to Mr. Miller, especially because he was mentally ill, immobilized through full-body metal restraints, and physically restrained by the Detention Officers.

103.    Lastly, Texas BoN Position Statement 15.30 and Standards of Nursing 217.11(1)(M), (1)(P) establish that a violent patient must still be provided treatment in order to stabilize the patient to prevent further health complications.[46] A nurse should also collaborate with other health care providers to ensure a violent patient receives appropriate care, and must not abandon their duty to the patient.

---

[43] TEXAS BOARD OF NURSING, 15.6 BOARD RULES ASSOCIATED WITH ALLEGED PATIENT "ABANDONMENT" OF A NURSE IN ANY PRACTICE SETTING (Adp. 2005, Amend. 2021); TEX. ADMIN CODE § 217.11.
[44] See id.
[45] See id.
[46] TEXAS BOARD OF NURSING, 15.30 WORKPLACE VIOLENCE (Adp. 2018, Amend. 2022); BOARD OF NURSING RULE 217.11(1)(M).

104.    As a result, any concerns that Mr. Miller was "aggressive," "combative," or a "safety risk" were irrelevant in the context of providing emergency medical treatment to Mr. Miller. The Nurse Defendants were required to take action or used their authority under TEX. ADMIN CODE § 224.1 to delegate the Detention Officer Defendants to aid in providing emergency medical treatment.[47] But the Nurse Defendants deliberately failed to provide medical treatment to save Mr. Miller's life, despite knowing that the denial or delaying of care would cause substantial risks to Mr. Miller's life.

105.    Following the standard initial health screening, the five present Detention Officer Defendants forced Mr. Miller through the final steps of the booking process.  At or around this time, the Detention Officer Defendants began to carry Mr. Miller because Mr. Miller was not walking on his own. Upon information and belief, Mr. Miller began to struggle to walk due to his increasing inability to breathe and respiratory collapse caused by the chemical weapons assault.

106.    After completing the booking process, the five Detention Officer Defendants had the ability to take Mr. Miller for further medical evaluation due to his worsening condition and inability to breathe.

107.    The Detention Officer Defendants were aware of Mr. Miller's worsening condition and were aware that he required emergency medical treatment because of Mr. Miller's continued complaint that he was unable to breathe.

108.    However, the Detention Officer Defendants proceeded to deliberately ignore taking such action and specifically reported that Mr. Miller was "too combative" to be taken for further medical evaluation. However, there was no lawful basis to deny him care at this time, especially because Mr. Miller could not be combative because of his full body restraints, his inability to

---

[47] See TEX. ADMIN CODE § 224.1

breathe, his asthmatic status, and his inability to walk. The Detention Officer Defendants present were also aware that continued denial or delaying care for a person struggling to breathe would cause substantial risks to a person's health.

### G. The Respiratory Collapse of Mr. Miller

109.    At or around 2:52 PM, Mr. Miller was carried by Defendants Tahmahkera, Beene, James, and Kautz to his cell. Defendant Kelsey supervised the physical transfer of Mr. Miller to the cell.

110.    At or around 2:58 PM, Mr. Miller was placed in the cell face down on his stomach. At this time, the Detention Officer Defendants finally removed the restraints on Mr. Miller's wrists and legs. For an unknown reason, Defendant Kautz and Defendant Kelsey decided to then reenter the cell to remove Mr. Millers uniform and leave him naked. The Detention Officer Defendants then left Mr. Miller in the cell lying face down on his stomach, thereby exacerbating Mr. Miller's breathing difficulties.

111.    While Mr. Miller's clothes were being removed, Defendant Wheeler informed Defendant Swan and Officer Bernal that Mr. Miller had been exposed to chemical weapons during the booking process. Defendant Swan and Officer Bernal were assigned to observe the jail unit where Mr. Miller was locked.

112.    Shortly afterwards, Defendants Tahmahkera, Beene, James, Kautz, and Kelsey left the jail unit. Defendant Swan then observed Mr. Miller struggle and crawl towards the toilet bowl and then splash toilet water on his face.

113.    At 3:12 PM, Defendant Swan personally signed the daily inspection record and wrote that he only observed Mr. Miller on his back at that time. Upon information and belief, Mr.

Miller had completely stopped breathing due to respiratory collapse when Defendant Swan signed the daily inspection record stating that Mr. Miller was on his back on the floor.

114.    Defendant Swan observed Mr. Miller actively dying without any movement in his chest at or around 3:12 PM but deliberately and wantonly took no action to intervene or provide Mr. Miller emergency medical attention. Defendant Swan proceeded to sign the daily inspection record despite having actual knowledge of Mr. Miller's cessation of breathing and respiratory collapse.

115.    At or around 3:19 PM, an unnamed resource nurse, acting upon their duty of care, went to evaluate Mr. Miller in his cell. The unnamed resource nurse observed Mr. Miller lying on his back and not breathing.

116.    The unnamed resource nurse then went to Officer Bernal and told him that Mr. Miller needed to receive immediate emergency medical attention.

117.    At or around this time, about an hour after Mr. Miller was assaulted, Officer Bernal proceeded to tell Defendant Swan that Mr. Miller was not breathing.

118.    Instead of immediately calling for emergency medical attention, Defendant Swan put another inmate that was on rotation back into his cell. Defendant Swan's actions significantly decreased the likelihood that Mr. Miller would survive as each second that a person does not breathe increases the likelihood that the person will suffer brain damage and death.

119.    Defendant Swan and Officer Bernal then proceeded to go into Mr. Miller's cell and discovered that Mr. Miller did not have a pulse. Mr. Miller had suffered a cardiac arrest from respiratory collapse and a lack of oxygen.

120.    At or around 3:22 PM, Defendant Swan called for a Code 6 Signal 1 (medical attention for an inmate).

121.    Defendant Swan called for a Code that did not require emergency medical services to respond because a Code 6 Signal 1 only illustrates that an inmate needs some form of medical attention. Defendant Swan did not indicate that Mr. Miller was not breathing or that he did not have a pulse when the Code 6 Signal 1 was made.

122.    Only a single emergency medical profession arrived, Emergency Medical Technician-Paramedic ("EMTP") Prentis Goss. EMTP Goss was unaware that Mr. Miller had stopped breathing until he arrived at the cell and observed Mr. Miller lying on his back.

123.    EMTP Goss then immediately ordered Defendant Swan and Officer Bernal to pull Mr. Miller out of his cell to allow for more workable space. EMTP Goss subsequently confirmed that Mr. Miller had no pulse, began CPR, and changed the code to a "Dr. Heart" at or around 3:25 PM. A "Dr. Heart" is a Code for "an inmate not breathing" and requires an emergency crash cart and an ambulance.

124.    Defendant Swan had multiple opportunities to immediately address Mr. Miller's respiratory collapse and cessation of breathing based on what he readily observed. Defendant Swan instead deliberately and wantonly ignored Mr. Miller's cessation of breathing until Officer Bernal forced the issue.

125.    Defendant Swan deliberately delayed calling for a "Dr. Heart" despite confirming Mr. Miller was not breathing and did not have a pulse, thereby wantonly delaying the time for Mr. Miller to receive proper emergency medical treatment.

### H.  **The Death of Robert Geron Miller**

126.    At or around 3:27 PM, Physician Assistant-Certified ("PAC") James Leddy and nurse Andrea Jimenez responded to the "Dr. Heart" with an emergency crash cart. PAC Leddy provided CPR, ventilation by bag valve mask to increase Mr. Miller oxygen levels, and a

Defibrillator shock to restart Mr. Miller's heart. EMTP Goss attempted IV access at this time but was unsuccessful.

127.    As resuscitation efforts continued, other medical professionals at the Jail responded to aid with bringing Mr. Miller back to life. The ambulance then responded at or around 3:36 PM, and Fort Worth Fire Department Medical Staff arrived at or around 3:38 PM.

128.    The various medical professionals began performing lifesaving maneuvers at or around 3:45 PM in an attempt to resuscitate Mr. Miller. The lifesaving maneuvers consisted of continued CPR, ventilation with the bag valve mask, and three EPIs.

129.    Eventually, at or around 3:53 PM, the ambulance EMTs were able to detect a weak pulse.  Mr. Miller was then moved to a transport bed to be transferred in the ambulance to John Peter Smith Hospital ("JPS"). Mr. Miller was escorted by Officer B. Rademaker.

130.    At or around 4:05 PM, the ambulance left for JPS. The ambulance arrived at JPS at or around 4:15 PM and was immediately brought to the emergency room. The hospital staff then started CPS/chest compressions and other lifesaving maneuvers; and were able to detect a weak pulse again at or around 4:23 PM. Mr. Miller was then intubated.

131.    At or around 4:45 PM, Mr. Miller was evaluated by the responding emergency medicine doctor. The doctor noted that Mr. Miller was "pepper sprayed and then was found unresponsive in cardiac arrest," and had a laceration on his forehead. The doctor further noted that Mr. Miller had decreased air movement bilaterally indicating that Mr. Miller was struggling to breathe.[48]

132.    Mr. Miller was subsequently taken to the Computed Tomography (CT) room and received comprehensive CT scans to determine the extent of his injuries. During this time, JPS

---

[48] *See* Barret Zimmerman & Donna Williams, *Lung Sounds*, STATPEARLS PUBLISHING (Aug. 30. 2021) https://www.ncbi.nlm.nih.gov/books/NBK537253/.

was able to acquire Mr. Miller's medical history and medical charts. Mr. Miller's medical history and charts confirmed that Mr. Miller was asthmatic.

133.     At or around 5:28 PM, an intensive care resident reviewed Mr. Miller's medical history, the CT scans of Mr. Miller, and numerous tests that been performed on Mr. Miller. The intensive care doctor then conducted an in-person evaluation of Mr. Miller.

134.     The intensive care doctor noted that Mr. Miller had (i) very low oxygen blood levels, (ii) excess carbon dioxide levels, (iii) no drugs or alcohol in his system, and (iv) zero brain activity without sedation, indicating complete brain death. The CT scan of Mr. Miller's chest showed "groundglass opacities" in his lungs indicating Mr. experienced significant lung inflammation, and/or fluid in his lungs causing aspiration, indicating he experienced substantial difficulties breathing.[49]

135.     The results provided strong evidence that Mr. Miller died due to a respiratory collapse which led to cardiac arrest. In addition, Mr. Miller's brain death indicated that Mr. Miller's respiratory collapse and cardiac arrest went without treatment for an extended period.

136.     Ultimately, the intensive care resident diagnosed Mr. Miller with brain death due to lack of oxygen, cardiac arrest, and acute respiratory failure with low oxygen levels. Mr. Miller also had multiple organ failures. Mr. Miller's organ failures, brain death, and cardiac arrest occurred because Defendants' actions led Mr. Miller to suffer respiratory failure.

137.     Following the evaluation, the intensive care doctor approved Mr. Miller's transfer to the JPS Intensive Care Unit ("ICU"). Mr. Miller then received treatment through various medication and received a mechanical ventilator in order to breathe.

---

[49] *See* Vol. 33(4), M. Infante et. al, <u>Differential Diagnosis and Management of Focal Ground-Glass Opacities</u>, EUROPEAN RESPIRATORY JOURNAL, at p. 821-27 (Apr. 2009).

138.    At or around 8:14 PM, Mr. Miller was evaluated by another doctor in the ICU. The doctor reviewed all of Mr. Miller's information and connected the chemical weapon assault to Mr. Miller's cardiac arrest; but could not make a firm connection because JPS health care professionals did not know how long after the chemical weapons assault that Mr. Miller suffered his cardiac arrest.

139.    However, based on all the tests, scans, and information available, the doctor wrote on Mr. Miller's chart that it was possible that Mr. Miller developed "bronchoconstriction" and that this led to respiratory failure and cardiac arrest. Bronchoconstriction (the tightening of the muscles in the lungs) is a noted health risk from the inhalation of OC chemical spray, and is significantly more likely if a person is asthmatic or suffers another respiratory illness.

140.    Upon information and belief, the intensive care doctor was unable to confirm his diagnosis of bronchoconstriction because he did not have knowledge of (i) Detention Officer Defendants' multiple uses of OC chemical weapons, (ii) the close proximity of the firing of OC chemical weapons at Mr. Miller's face, (iii) the full body restraints on Mr. Miller, (iv) the denial of emergency medical attention on multiple occasions, and (v) Mr. Miller's final words; "I can't breathe." All the above factors strongly supported a diagnosis of bronchoconstriction, and subsequent cardiac arrest, caused by the Defendants.

141.    The doctors at the ICU attempted to manage Mr. Miller's condition overnight, but the prognosis for recovery was poor due to his critical condition.

142.    The following morning, August 1, 2019, at 5:40 AM, Mr. Miller's condition worsened and he flatlined. Medical staff did all they could to attempt to bring Mr. Miller back to life but failed.

143.    Mr. Miller was pronounced dead at or around 5:45 AM. The hospital discharge significant findings stated that Mr. Miller reported cardiac arrest at a jail after being sprayed with pepper spray. Mr. Miller died around sixteen hours after being forcibly brought under Defendants' custody.

144.    Subsequently, at or around 8:20 AM, Mr. Miller was officially "booked out" of the Tarrant County Jail.

145.    The Tarrant County Sheriff at the time, Sheriff Bill Waybourn, was informed of Mr. Miller's death the same morning. However, Plaintiff, as Mr. Miller's surviving spouse, was not informed of Mr. Miller's death by the Defendants. Plaintiff only learned about Mr. Miller's death from a newspaper article commenting on a death at the Tarrant County Jail several days later, but the newspaper article did not indicate any wrongdoing behind Mr. Miller's death.

## I.    The Unlawful Failures in Investigating Mr. Miller's Death

146.    Pursuant to Texas Law, the Department of Public Safety – Texas Rangers Division ("Rangers") investigated Mr. Miller's death at the Tarrant County Jail.

147.    TEX. GOV'T CODE § 511.021 code requires that upon the death of a prisoner in a County Jail, the Texas Commission on Jail Standards ("TCJS") shall appoint a law enforcement agency, other than the local law enforcement agency that operates the County Jail, to investigate the death as soon as possible.[50]

148.    TEX. ADMIN. CODE 37 § 269.1(5) also requires the TCJS to be notified of all deaths of inmates while in custody of a sheriff/operator within twenty-four (24) hours of the death.[51] TCJS shall then appoint a law enforcement agency, other than the local law enforcement agency, to

---

[50] *See* TEX. GOV'T CODE § 511.021
[51] *See* TEX. ADMIN. CODE 37 § 269.1(5)

investigate the death. Upon conclusion of the investigation by the designated law enforcement agency, a report shall be made and submitted to the TCJS.[52]

149.    However, Sergeant Cliff Shelton of the Tarrant County Sheriff's Office directly contacted the Rangers, rather than the TCJS.

150.    Sgt. Shelton specifically called Ranger Trace McDonald at or around 3:45 PM on July 31, 2019 to investigate the developing situation involving Mr. Miller. Ranger McDonald was the lead investigator under the supervision and approval of Ranger Jason Bobo.

151.    Upon information and belief, Ranger McDonald has an intimate relationship with the Tarrant County Jail as he has investigated at least twenty deaths at the Jail since 2019.[53]

152.    Sgt. Shelton also requested Tarrant County Sheriff's Office Detectives Richard Harwell, Jarvis, and Mike Cline; and Crime Scene Investigators Clancy and Lawler. Tarrant County's detectives/investigators were intended to assist the Tarrant County Jail with an in-custody death investigation.

153.    Tarrant County's detectives/investigators were the first individuals on the scene investigating Mr. Miller's respiratory failure and cardiac arrest, rather than an independent law enforcement agency.

154.    In violation of Texas Law, Ranger McDonald proceeded to collaborate with Detective Kline to briefly interview Defendants Tahmahkera, Beene, Swan, and Kelsey. Ranger McDonald and Detective Kline did not conduct any further interviews with any witnesses or involved parties.

---

[52] *See id.*
[53] Nichole Manna, *Dead Body Lay in Tarrant County Jail for 6 Hours. Lawsuit alleges Jailers told to Lie,* FORT WORTH STAR-TELEGRAM (May 05, 2022) https://www.star-telegram.com/news/local/fort-worth/article261023947.html#storylink=related_inline

155.    Instead, on or around July 31, 2019, Ranger McDonald and Detective Kline requested that the Individual Defendants write supplemental reports regarding their involvement with Mr. Miller.

156.    Two days later, on or around August 2, 2019, Ranger McDonald and Detective Kline jointly attended Mr. Miller's autopsy performed by Tarrant County's Medical Examiner, Dr. Richard Fries ("ME Fries").

157.    Mr. Miller's initial autopsy only focused on whether Mr. Miller died of a physical injury, and thus was not focused on a respiratory collapse caused by the chemical weapons assault.

158.    ME Fries did not determine a cause of death on August 2, 2019. However, Ranger McDonald noted in the report that Mr. Miller's cause of death was pending toxicology results.

159.    Upon information and belief, Dr. Fries, on behalf of Tarrant County, and Ranger McDonald sought to blame Mr. Miller's death on drugs to avoid any finds of wrongdoing on behalf of the Individual Defendants.

160.    Later the same day, the supplemental reports were collected by Detective Kline, rather than being delivered directly to Ranger McDonald. Detective Kline then emailed Ranger McDonald a copy of the documents and reports created by the Tarrant County Jail.

161.    On or around August 8, 2019, ME Fries transcribed Mr. Miller's autopsy report. The toxicology report was then received on August 12, 2019, and was negative for all substances besides ibuprofen and lidocaine. No further action was taken on the autopsy report at this time.

162.    Ranger McDonald proceeded to complete his report of Mr. Miller's death without any further investigatory acts.

163.    Upon information and belief, an actual independent investigation into the cause of Mr. Miller's death under Texas Law would have included such important and significant information. But the investigation remained open because the final autopsy report was pending.

### J.    The Initial Autopsy Report created by Tarrant County's Employee

164.    On or around April 29, 2020, Detective Kline personally called ME Fries' office about the status of the autopsy. Detective Kline then allegedly spoke with ME Fries' secretary and directed her to speak with ME Fries about Mr. Miller's death.

165.    Thirty-five days later, on or around June 3, 2020, ME Fries submitted Mr. Miller's final autopsy report and concluded that Mr. Miller died of "natural causes" arising from sickle cell crisis.

166.    ME Fries relied on the presence of sickled red blood cells as his only evidence. However, Mr. Miller did not have a medical history of sickle cell disease and none of the doctors at the JPS hospital discussed sickle cell crisis as a possible cause of death.

167.     Further, medical experts recognize that it is misleading to attribute death to sickle cell only on the presence of cells that have sickled because cells tend to sickle "when people with the condition stop breathing."[54] The presence of sickled cells following a respiratory collapse death does not provide evidence of causation as it does not mean the cells were like that before death, and the trait alone cannot cause death.[55] Mr. Miller had sickle-cell trait, then it is expected that sickled cells would be found during an autopsy due to his respiratory collapse and cessation of breathing.

---

[54] Michael LaForgia & Jennifer Valentino-DeVries, *How a Genetic Trait in Black People can give the Police Cover*, N.Y. TIMES (May 15, 2021) https://www.nytimes.com/2021/05/15/us/african-americans-sickle-cell-police.html.
[55] *See id.*

168.    In addition, the autopsy report contained several glaring omissions indicating questionable credibility. The autopsy report specifically (i) dismissed Mr. Miller's neck trauma as consistent with resuscitation, but the injuries were more consistent with blunt force, (ii) ignored marked swelling of the brain, (iv) ignored Mr. Miller's asthmatic medical history by stating inflammation was not "significant", (v) and ignored any discussion of the impact of the use of OC chemical weapons.

169.    The most significant and alarming omission was ME Fries discussion of the chest CT report of Mr. Miller done at JPS. The hospital CT report had three findings; (i) rib fractures consistent with CPR, (ii) groundglass opacity of the lungs indicating aspiration/breathing struggles, and (iii) findings of hypoperfusion in the organs indicating low blood flow.

170.    However, ME Fries' final autopsy report deliberately excluded the strongest evidence that Mr. Miller was killed due to respiratory collapse from struggling to breathe.

171.    The autopsy report, released 306 days after the autopsy, deliberately hid the Individual Defendants' actions in causing Mr. Miller's death through the use of deadly excessive force and the deliberate denial or delay of emergency medical treatment. It further allowed for Tarrant County to avoid any negative consequences.

172.    The day following the release of the autopsy report, Ranger McDonald was contacted by the Tarrant County District Attorney's office who relayed the findings of the autopsy. Defendant McDonald asked no further questions, conducted no further investigation, and closed the file on Mr. Miller's death.

**K.  The Failure to Inform Plaintiff of Any Information about Mr. Miller's Death**

173.    Plaintiff was unaware of the connection between the Individual Defendants' actions or conduct and her husband's death. All that she was aware was that her husband had died while in the custody of Tarrant County at the Tarrant County Jail.

174.    However, Plaintiff sought to learn more information behind the cause of Mr. Miller's death. Plaintiff thus diligently tried to gather information from Tarrant County and the Rangers. However, Plaintiff was unable to acquire any further information from either entity, despite several direct requests. Nor was Plaintiff provided the completed but faulty autopsy report submitted by ME Fries. Upon information and belief, Tarrant County intentionally concealed this information and relevant documentation for the benefit of the Individual Defendants.

175.    Plaintiff thus acquired legal representation and sued Tarrant County on July 30, 2021 in order to force the Tarrant County to release the above information regarding the Individual Defendants' actions and their connection to Mr. Miller's Death. However, at that time, Plaintiff did not possess any information beyond the fact that her husband died at the Tarrant County Jail.

176.    Plaintiff thus submitted a Texas Public Records Request against the Texas Department of Public Safety ("TxDPS") regarding their investigation of Mr. Miller's death on August 12, 2021. Plaintiff received confirmation from TxDPS that the request was received the same day.

177.    The Texas Public Information Act requires a governmental body to provide a requestor within ten days either (1) the requested records; or (2) a written statement that the governmental body wishes to withhold the requested information.[56]

---

[56] TEX. GOV. CODE § 552.301.

178.    However, the TxDPS failed to release the information as required by TEX. GOV'T CODE § 552.301. From August 21, 2021 to September 3, 2021, Plaintiff called the TxDPS Office of General Counsel on four separate occasions and left voicemails inquiring as to the status of Plaintiff's August 12, 2021 Public Records Request.

179.    On September 7, 2021, Plaintiff sent a reply to the confirmation email requesting an update as well as the release of all relevant information. The only response Plaintiff received was a confirmation email in response stating that Plaintiff would receive a response in ten days.

180.    On the same day, Plaintiff submitted another public records request for the same information regarding Mr. Miller's death and the TxDPS's investigation. Once again, Plaintiff received a confirmation email on the same day. Plaintiff then telephoned the TxDPS's office on September 9th and again on September 10th requesting a response to Plaintiff's Public Records Request.

181.    On October 22, 2021, Plaintiff filed a First Amended Complaint, now including a Writ of Mandamus under TEX. GOV'T CODE 552.321 and adding the TxDPS as a Defendant for violations of the Texas Public Information Act, including the details of Plaintiff's several attempts to obtain the necessary records regarding Mr. Miller's death while in custody.

182.    On the same day, Plaintiff submitted a Public Records Request against the Tarrant County Sheriff's Office requesting all information pertaining to the details of Mr. Miller's arrest, detainment, and death.

183.    On November 23, 2021, Plaintiff filed an Opposed Motion to Stay Proceedings Pending Resolution of the Writ of Mandamus against the TxDPS included in Plaintiff's Amended Complaint.

184.    On November 29, 2021, the Tarrant County responded to Plaintiff's request by refusing to produce the requested information, and also directed the Texas Attorney General's Office to hold that the "voluminous number of documents" about Robert Geron Miller are exempt from public disclosure under the Texas Public Information Act.

185.    On or around November 30, 2021, for the first time since Mr. Miller's death, Plaintiff learned relevant information from a *New York Times* article that had investigated incidents in Tarrant County. However, the *New York Times* article failed to include the names of the Individual Defendants. Nor did the *New York Times* article include any specific details beyond stating that "Mr. Miller sustained head injuries when one threw him to the ground, and he complained of chest pain after another guard blasted him with pepper spray."

186.    The only other information that Plaintiff learned at this time was that Mr. Miller "was dragged facedown to a cell where another jailer saw him splayed out on the floor, splashing toilet water on his face. Twelve minutes later, the Ranger noted, Mr. Miller stopped breathing."

187.    Plaintiff attempted to amend to include such information into her complaint but was denied leave to amend by the honorable Judge Reed O'Connor on February 11, 2022. Plaintiff's previous lawsuit was dismissed on the same day for failing to plausibly state a claim.

188.    On or around February 12, 2022,Tarrant County finally provided Plaintiff documentation responsive to her public records request. The documentation included five pages of five pages of narrative statements from some of the Detention Officer Defendants.

189.    At this time, Plaintiff finally learned of the Individual Defendants' involvement in her husband's death. However, the final report failed to include a substantial amount of information.

190.    The narrative information failed to include details about (i) the Individual Defendants' knowledge of Mr. Miller's mental health disabilities; (ii) the restraints on Mr. Miller's wrists when he was slammed to the ground, (iii) the use of physical force to pin Mr. Miller to the ground, (iv) the extent of force through chemical weapons used while Mr. Miller was in restraints and pinned to the ground, (v) the initial medical intake screening done by Defendant Singleton, (vi) Mr. Miller's repeated requests for medical attention, and (vii) Mr. Miller's asthma and his struggles to breathe.

191.    On April 13, 2022, two months after Plaintiff's claims were dismissed, the TxDPS released 252 pages of "responsive records" to Plaintiff's previously unlawfully ignored requests under the Texas Public Information Act.

192.    The 252 pages of responsive records that Plaintiff finally received on April 13, 2022, after Plaintiff's claims were dismissed, provided significant details and evidence that would have sufficiently supported Plaintiff's claims and conclusively provided Plaintiff the knowledge and awareness of the connection between Defendants' unlawful actions and Mr. Miller's death. The information further provided Plaintiff knowledge of all the information missing in Ranger McDonald's final report.

193.    On May 27, 2022, Plaintiff sought to set aside Judge O'Connor's previous ruling through Fed. R. Civ. P. 60(b) based on the previously intentionally withheld information that she had been provided. Judge O'Connor proceeded to deny Plaintiff's Fed. R. Civ. P. 60(b) motion on July 8, 2022.

L.  **Tarrant County's Continued Cover-Up**

194.    On October 13, 2022, the Fort Worth Star-Telegram published an article[57] detailing the events of Mr. Miller's death, the issues with Tarrant County's explanation behind his death, and Tarrant County's actions to continue to avoid accountability.

195.    The Star Telegram's report was made possible "using records previously withheld by authorities[.]" Indeed, the report stated that the Tarrant County Sheriff's Office "tried to withhold nearly every detail about what happened to Miller inside the jail." The Sheriff's Office did not even "reveal to a reporter that a struggle had occurred or that he was pepper-sprayed."

196.    The report further noted Plaintiff's "unsuccessful attempts for nearly three years to obtain information about what happened to her husband from the [Tarrant County] Sheriff's Office and Texas Rangers." Despite her attempts, Plaintiff "knew nothing about the circumstances of Miller's death for nearly three years."

197.    Notably, the "Star-Telegram sought experts outside of Texas to review Miller's medical records, which are included in the 252-page report."

198.    One expert, Dr. Hannah Lichtsinn, a sickle cell expert, examined Mr. Miller's previous blood work and found that Mr. Miller conclusively did not suffer from sickle cell anemia.

199.    Roger Mitchell, the former chief medical examiner for the District of Columbia who is now chair of pathology at Howard University, stated that records from "hospital list active problems, yet none of those problems are sickle cell[.]" Mitchell noted that it was impossible for Mr. Miller to have died of a sickle cell crisis "without having the underlying disease of sickle cell anemia or other sickling disorders."

---

[57] Nichole Manna, *His death was ruled 'natural.' But what Tarrant jailers did to him suggests otherwise*, FORT WORTH STAR-TELEGRAM (Oct. 13, 2022), https://www.star-telegram.com/news/local/fort-worth/article263839377.html.

200.    "Sven-Eric Jordt, a professor of anesthesiology at Duke University who studies the effects of pepper spray on the body, said it's not surprising that Miller would have felt chest pain, considering the amount of damage pepper spray can cause to lungs." Professor Jordt further explained that Mr. Miller's death was a human rights issue and a human medical rights issue. Professor Jordt specifically stated that "if you basically have someone immobilized ... when they're in handcuffs like this person, do you need to pepper spray them? I'm really concerned that this pepper spray was used indoors."

201.    Following the publishing of the story, there were extensive calls in the community for Tarrant County to act regarding Mr. Miller's death. Nine criminal justice advocates directly addressed Tarrant County's Commissioner's Court during Commissioner's Court meeting on October 18, 2022, in order to compel the Commissioner's Court to open an investigation about the death of Mr. Miller at the Tarrant County Jail.[58]

202.    At the meeting, County Commissioner Roy Brooks stated that he was "troubled by what appears to be a **<u>coverup</u>** in the death of Robert Miller." He then stated that Tarrant County was going to review the findings of ME Fries.

203.    On December 13, 2022, Tarrant County contracted with an independent forensic pathologist, Dr. J. Scott Denton, in order to review Mr. Miller's death and the findings of ME Fries.[59] The contract was set to expire on February 28, 2023.[60]

[58] Nichole Manna, *Medical examiner to review jail death of Robert Miller after Star-Telegram investigation*, FORT WORTH STAR-TELEGRAM (Oct. 18, 2022), https://www.star-telegram.com/news/local/fort-worth/article267498578.html.

[59] Sam Baker, *Tarrant County jail death spurs an independent autopsy*, KERA (Dec. 13, 2022), https://www.keranews.org/criminal-justice/2022-12-13/tarrant-county-jail-death-spurs-an-independent-autopsy.

[60] Abby Church, *Tarrant County commissioners to discuss jail death case in closed session*, FORT WORTH STAR-TELEGRAM (Apr. 14, 2023), https://news.yahoo.com/tarrant-county-commissioners-discuss-jail-184831314.html.

204.    However, Tarrant County failed to release the results of the independent autopsy after the contract expired.[61] Members of the community began regularly calling for Tarrant County to release the results.

205.    On April 4, 2023, several members of the public stood before Tarrant County's Commissioner's Court and demanded the release of the autopsy review of Mr. Miller's death. Despite these calls from the public, "[t]op Tarrant County officials remain[ed] silent about the autopsy."[62]

206.    On April 11, 2023, Sheriff Waybourn held a press conference as "[Tarrant County] continu[ed] to withhold information about [the] third-party autopsy review into" Mr. Miller's death.[63] Sheriff Waybourn publicly endorsed the Individual Defendants and said "at no time has a jailer been at fault for hurting or abusing, or absolutely, as terms of murdering have been used, that has never occurred." Sheriff Waybourn's comments reflected the culture of ignoring misconduct at the Tarrant County Jail and the continued cover-up of the Individual Defendants' actions towards Mr. Miller.

207.    On April 18, 2023, KERA News communicated with Dr. Denton about his contract with Tarrant County to review Mr. Miller's death.[64] Dr. Denton revealed that the review never occurred because Tarrant County deliberately failed to send any of Mr. Miller's records to him.[65]

---

[61] Miranda Suarez, *Public calls for release of independent autopsy review of Tarrant County inmate who died in custody*, KERA (Apr. 4, 2023), https://www.keranews.org/news/2023-04-04/public-calls-for-release-of-independent-autopsy-review-of-tarrant-county-inmate-who-died-in-custody.
[62] *Id.*
[63] Abby Church, *No murders by jailers in Tarrant County, sheriff says in touting office's accomplishments*, FORT WORTH STAR-TELEGRAM (Apr. 11, 2023), https://www.star-telegram.com/news/politics-government/article274201955.html.
[64] Miranda Suarez, *Tarrant County approved contract to examine a jail death. Expert says that review never happened*, KERA (Apr. 22, 2023), https://www.keranews.org/news/2023-04-22/tarrant-county-approved-a-contract-to-examine-a-jail-death-expert-says-that-review-never-happened.
[65] Abby Church, Tom Johanningmeier, Ciara McCarthy, *Tarrant says Mayo Clinic backs autopsy in Robert Miller jail death, contrary to experts*, FORT WORTH STAR-TELEGRAM (Apr. 24, 2023), https://www.star-telegram.com/news/politics-government/article274201955.html.

208.     Records revealed that on the last day of the contract, Tarrant County told Dr. Denton that it would send all of Mr. Miller's records for Dr. Denton's review and then extend his contact beyond February 28, 2023.[66] However, the "materials were never sent, nor was the contract extended."

209.     Instead, Tarrant County doubled down on its explanation that Mr. Miller died from sickle cell crisis because Mr. Miller possessed the sickle cell trait based on a blood test sent to the Mayo Clinic. However, experts commissioned by the Fort Worth Telegram stated that "there is no blood test that can diagnosis a sickle cell crisis, as the [Tarrant County] claimed in its statement."[67]

210.     After Tarrant County released records on its correspondence with the Mayo Clinic, Dr. Lichtsinn stated that she "believes that county officials **lied** when they said in [their] statement that the Mayo Clinic had confirmed sickle cell crisis as Miller's cause of death."[68] Dr. Lichtsinn stated that the "documentation from Mayo said absolutely nothing about whether he had a sickle cell crisis[.]"[69]

211.     In addition, the American Society of Hematology, "which represents 18,000 medical professionals who study and treat blood diseases, stated that "[i]t is medically inaccurate to claim sickle cell crisis as the cause of death based solely on the presence of sickled cells at autopsy."[70] Indeed, the American Society of Hematology stated blaming a sudden death on sickle

---

[66] *Id.*
[67] *Id.*
[68] Abby Church, Ciara McCarthy, *Tarrant doubles down on sickle cell cause of jail inmate's death. Experts call it a lie*, FORT WORTH STAR-TELEGRAM (May 9, 2023), https://www.star-telegram.com/news/politics-government/article275222971.html
[69] *Id.*
[70] Abby Church, Tom Johanningmeier, Ciara McCarthy, *Tarrant says Mayo Clinic backs autopsy in Robert Miller jail death, contrary to experts*, FORT WORTH STAR-TELEGRAM (Apr. 24, 2023), https://www.star-telegram.com/news/politics-government/article274201955.html.

cell crisis for a person with sickle cell trait, such as Tarrant County's position on Mr. Miller's death, "must be viewed with profound skepticism[.]"[71]

212.    An expert commissioned by the Fort Worth Telegram, Dr. Rakhi Naik, an associate professor of medicine at John Hopkins School of Medicine, said "someone with the sickle cell trait alone – ant not the sickle cell disease – could not die of a sickle cell crisis." Dr. Naik further stated that the "assumption that Miller or any other person with the trait could die from a crisis is based on flawed medical research from decades ago[.]"

213.    Dr. Naik conclusively stated that attributing Mr. Miller's death to sickle cell crisis is not possible as "there is not way for that to happen under physiologic conditions with somebody who has sickle cell trait."

214.    Another expert, Dr. Lichtsinn, further supported Dr. Naik's conclusion and expressly stated that "[s]ickle cell trait cannot lead to a sickle cell crisis…[t]that's not how the disease works."

215.    Therefore, ME Fries' findings about Mr. Miller's death, supported by Tarrant County in order to avoid any liability for Individual Defendants, were not medically accurate.

216.    On April 24, 2023, Tarrant County changed Mr. Miller's matter of death from "natural" to "undetermined" due overwhelming pressure from the public.[72] However, th Tarrant County's Judge Tim O'Hare refused to condemn the actions of the Individual Defendants and publicly stated that none of "the professional staff at the Tarrant County Jail engaged in any misconduct or wrongdoing."[73]

---

[71] *Id.*
[72] *Id.*
[73] *Id.*

217.    County Judge O'Hare thus continued Tarrant County's action in covering up Mr. Miller's death and the actions of the Individual Defendants. In fact, Dr. Lichtsinn stated that Tarrant County's insistence that Mr. Miller died due to sickle cell crisis "super appears to be related to finding a reason to explain a death when the real reason is something that they're trying to keep covered."[74]

218.    On May 9, 2023, Tarrant County released an amended autopsy report from ME Fries and documentation from their correspondence with the Mayo Clinic.[75] Despite the overwhelming evidence and scientific consensus, the amended autopsy report listed Mr. Miller's cause of death as sickle cell crisis. In the amended autopsy report, ME Fries included several medical sources to rely on this finding.

219.    Dr. Naik and Dr. Lichtsinn reviewed the amended autopsy report for the Fort Worth Telegram and noted the medical sources used by ME Fries were vastly different than the context behind Mr. Miller's death and also relied on outdated science.[76] Both experts conclusively stated that Mr. Miller "could not have died from sickle cell crisis, which can only occur in people with sickle cell disease[,]" because Mr. Miller did not have the disease.[77]

220.    Dr. Naik specifically stated that ME Fries and Tarrant County "are falsely making the association between sickle cell trait and sickle cell disease."[78]

221.    Roger Mitchell, the former chief medical examiner for the District of Columbia who is now chair of pathology at Howard University, told the Fort Worth Star Telegram that Mr.

---

[74] Id.

[75] Abby Church, Ciara McCarthy, *Tarrant doubles down on sickle cell cause of jail inmate's death. Experts call it a lie*, FORT WORTH STAR-TELEGRAM (May 9, 2023), https://www.star-telegram.com/news/politics-government/article275222971.html

[76] Id.

[77] Id.

[78] Id.

Miller's actually died from a depletion of oxygen. <u>Mr. Mitchell stated that the answer as to why Mr. Miller's had decreased oxygen in his body is "because he was pepper sprayed."</u>[79] Based on this analysis, Mr. Mitchell stated that Mr. Miller's "cause and manner of death are not natural."[80]

222.    Therefore, the Individual Defendants' excessive use of force combined with the failure to provide immediate emergency care more likely than not killed Mr. Miller.

223.    At this time, none of the Individual Defendants have been disciplined by Sheriff Waybourn for their actions that caused Mr. Miller's death. Tarrant County has also refused to change its stance that Mr. Miller died due to sickle cell crisis.

**M.  <u>Robert Geron Miller's death and its impact on Plaintiff</u>**

224.    Mr. Miller was thirty-nine (39) years old when he was killed by the Defendants acting in concert. He was a valuable member of his family and deeply loved by Plaintiff, and her children.

225.    Plaintiff, as the surviving spouse of Mr. Miller, consistently tried to get some answer as to the circumstances of her husband's death but had been denied almost all avenues for information, and has fought to receive any information under the Texas Public Information Act.

226.    Recent reporting has uncovered that Tarrant County coordinates efforts to block open records requests through obstruction by any means possible.[81]

227.    Plaintiff's struggle to determine how and why Mr. Miller has deeply affected her emotionally and caused extensive suffering.

228.    Plaintiff has also suffered substantially from the death of her husband by virtue of the destruction of the marital relationship, including the right to love, affection, solace, comfort,

---

[79] *Id.*
[80] *Id.*
[81]    *Honeypotting the Religious Right*, FORT WORTH WEEKLY (Apr. 20, 2022) https://www.fwweekly.com/2022/04/20/honeypotting-the-religious-right/.

companionship, society, emotional support, and happiness. Plaintiff will continue to suffer anguish, grief, and sorrow because of Mr. Miller's death and is likely to continue to suffer for a significant period of time.

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Excessive Use of Physical Force)**
**(As to Defendant Tahmahkera)**

263.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

264.    The conduct alleged herein deprived Mr. Miller of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from excessive use of force as a pretrial detainee.

265.    The actions of Defendant Tahmahkera by slamming Mr. Miller on the ground while he was in handcuffs violated Mr. Miller's clearly established constitutional rights, and was not objectively reasonable under the circumstances.

266.    The Supreme Court has established that excessive force violations against a pretrial detainee under the Fourteenth Amendment are evaluated through the objective facts and circumstances of each particular case and from the perspective and knowledge of the defendant officers. *Kingsley v. Hendrickson,* 135 S.Ct. 2466, 2473 (2015). The Court found that the following non-exclusive factors bear on the objective reasonableness of the use of force: (i) the relationship between the need for the use of force and the amount of force used; (ii) the extent of the plaintiff's injury; (iii) any effort made by the officer to temper or to limit the amount of force; (iv) the severity of the security problem at issue; (v) the threat reasonably perceived by the officer; and (vi) whether the plaintiff was actively resisting. *See id.*

267.    The use of force by Defendant Tahmahkera occurred without any limit to the use of force and while Mr. Miller was handcuffed behind his back, surrounded by three larger in size Detention Officer Defendants, and without any other detainees or security risks present. Further, Mr. Miller did not attack Defendant Tahmahkera, was not actively resisting, and was not an immediate threat.

268.    As a result, Defendant Tahmahkera's conduct violated Mr. Miller's clearly established constitutional right to be free from excessive force as a pretrial detainee. *See Cowart v. Erwin*, 837 F.3d 444, 454–55 (5th Cir. 2016) ("We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued'[.]"); *see also Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding that a suspect pulling his arm out of an officer's grasp, without more, was insufficient to find an immediate threat to the safety of the officers to justify the amount of force used).

269.    As a result of Defendant Tahmahkera's use of excessive force, Mr. Miller suffered a significant head injury, and emotional distress.

270.    Defendant Tahmahkera further acted with evil motive or intent and/or reckless and callous indifference to Mr. Miller's Fourteenth Amendment rights, entitling Plaintiff to punitive damages.

271.    Plaintiff's requests for relief are set forth below.

## AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Excessive Use of Force – Chemical Weapons)
### (As to Defendant Tahmahkera and Defendant Kelsey)

272.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

273.    The conduct alleged herein deprived Mr. Miller of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from excessive use of force as a pretrial detainee.

274.    The actions of Defendant Tahmahkera and Defendant Kelsey to fire chemical weapons at Mr. Miller violated his clearly established constitutional rights, and was objectively unreasonable under the circumstances.

275.    The Supreme Court has established that excessive force violations against a pretrial detainee under the Fourteenth Amendment are evaluated through the objective facts and circumstances of each particular case and from the perspective and knowledge of the defendant officers. *Kingsley,* 135 S.Ct. at 2473. The Court found that the following non-exclusive factors bear on the objective reasonableness of the use of force: (i) the relationship between the need for the use of force and the amount of force used; (ii) the extent of the plaintiff's injury; (iii) any effort made by the officer to temper or to limit the amount of force; (iv) the severity of the security problem at issue; (v) the threat reasonably perceived by the officer; and (vi) whether the plaintiff was actively resisting. *See id.*

276.    The use of force by Defendant Tahmahkera and Defendant Kelsey occurred without any limit to the use of chemical weapons and while Mr. Miller was in full-body metal restraints, physically pinned face down on the ground by at least of the Detention Officer Defendants, and without any other detainees or security risks present. Mr. Miller also did not attack the Detention Officer Defendants, was not actively resisting, and was not an immediate threat.

277.    As a result, Defendant Tahmahkera's and Defendant Kelsey's conduct violated Mr. Miller's clearly established constitutional right to be free from excessive force as a pretrial detainee. *See McCoy v. Alamu*, 950 F.3d 226, 232 (5th Cir. 2020) (holding that the 5th Circuit and

other circuit courts have frequently found constitutional violations in cases where a restrained or subdued person is subjected to the use of force and finding that the use of chemical weapons on such a person is excessive in a prison) (citing *Kitchen v. Dallas Cty.*, 759 F.3d 468, 479 (5th Cir. 2014)), *rev'd on other grounds by McCoy v. Alamu*, 141 S.Ct. 1364 (Mem) (2021); *see also Vizcayno v. Michael Unit,* 2020 WL 5536504 (E.D. Tex. 2020) (holding that it is a constitutional violation for prison officials to use chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain) (citing *Soto v. Dickey,* 744 F.2d 1260, 1270 (7th Cir. 1984)).

278.    Defendant Tahmahkera's and Defendant Kelsey's excessive use of chemical weapons caused Mr. Miller extreme pain, suffering, blindness, inability to breathe, respiratory collapse, eventual cardiac arrest; and ultimately caused the death of Mr. Miller.

279.    Defendant Tahmahkera and Defendant Kelsey further acted with evil motive or intent and/or reckless and callous indifference to Mr. Miller's Fourteenth Amendment rights, entitling Plaintiff to punitive damages.

280.    Plaintiff's requests for relief are set forth below.

**AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A § 1983, Civil Action For Deprivation of Rights**
**(Failure to Intervene or Protect – Excessive Force)**
**(As to Defendant Kelsey, Defendant Tahmahkera, Defendant Beene, and Defendant Wheeler)**

281.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

282.    The conduct alleged herein deprived Mr. Miller of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from excessive use of force as a pretrial detainee.

283.    The Detention Officer Defendants failed to intervene or protect Mr. Miller from the excessive use force that violated Mr. Miller's clearly established constitutional rights, and was objectively unreasonable under the circumstances.

284.    A government officer is liable as a bystander when the officer fails to take reasonable steps to protect an inmate from another officer's deprivation of constitutional rights. *See Drumm v. Valdez,* 2019 WL 7494443 at *5 (N.D. Tex. 2019) (citing *Davis v. Cannon*, 91 F. App'x 327, 329 (5th Cir. 2004)).

285.    Bystander liability in this context occurs when the officer (1) had a reasonable opportunity to realize the excessive nature of the use of force, (2) had a reasonable opportunity to prevent the harm, and (3) chose not to act. *See id.* (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

286.    Defendants acted in concert to place full-body metal restraints on Mr. Miller and pin Mr. Miller face down on the ground while the excessive use force occurred. Each of the present Detention Officer Defendants was physically present and witnessed the use of excessive force but failed to take any action to intervene or to protect Mr. Miller.

287.    As a result, the Detention Officer Defendants' conduct made them liable for the violation of Mr. Miller's clearly established constitutional right to be free from excessive force as a pretrial detainee. *See Thomas v. Castillo*, 2018 WL 4290801, at *4 (N.D. Tex. 2018) (holding that allegations that an officer observed another officer's use of force and assisted in pinning the person down was sufficient to establish bystander liability) *adopted* by 2018 WL 4283558 (N.D. Tex. 2018).

288.    The Detention Officer Defendants' failure to intervene or protect Mr. Miller from the excessive use of chemical weapons and physical force allowed Mr. Miller to suffer physical

harms, extreme pain, blindness, inability to breathe, respiratory collapse, eventual cardiac arrest; and ultimately allowed the killing of Mr. Miller.

289.    The Detention Officer Defendants further acted with evil motive or intent and/or reckless and callous indifference to Mr. Miller's Fourteenth Amendment rights, entitling Plaintiff to punitive damages.

290.    Plaintiff's requests for relief are set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Denial of Basic Human Needs – Medical Care)**
**(As to all Defendants)**

291.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

292.    The conduct alleged herein deprived Mr. Miller of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from punishment and the right to medical care.

293.    The Defendants deliberately refused to treat Mr. Miller, ignored his serious medical complaints, delayed emergency medical treatment, and evinced a wanton disregard for Mr. Miller's serious medical needs that violated Mr. Miller's clearly established constitutional rights.

294.    A government official violates a pretrial detainee's Fourteenth Amendment right to medical care when the officials act with deliberate indifference to a detainee's serious medical needs. *See Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020) (citing *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020))

295.    Officials act with deliberate indifference to serious medical needs when (i) the officials are aware of underlying facts indicating a substantial risk of serious harm exists and (ii)

the officials must also draw the inference. *See Baughman v. Hickman*, 935 F.3d 302, 307 (5th Cir. 2019) (citing *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015)).

296.    Deliberate indifference to serious medical needs can be established by the refusal to treat a detainee, ignoring medical complaints, intentionally incorrect medical treatment, or any similar conduct that would clearly evince a wanton disregard for any medical needs. *See id.* at 309 (citing *Perniciaro v. Lea*, 901 F.3d 241, 258 (5th Cir. 2018)). Further, the denial of recommended medical treatment is often sufficient to show deliberate indifference. *See id.* (citing *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018)).

297.    The Defendants had actual knowledge that Mr. Miller was exposed to dangerous levels of OC chemicals that cause substantially increased the risk of medical harms. The Defendants were thus aware of the substantial risk of serious harm that results from the use of chemical weapons, but failed to treat Mr. Miller and ignored his medical complaints.

298.    The Defendants also had actual knowledge of Mr. Miller's complaints of shortness of breath combined with chest pain, exacerbated asthma, and inability to breathe. The Defendants were also aware of the substantial risk of serious harm that results from untreated shortness of breath combined with chest pain, substantial risks of OC chemicals on individual with asthma or other similar lung conditions, and likelihood of death from being unable to breathe. However, none of the Individual Defendants responded to his medical complaints or provided immediate medical treatment.

299.    Defendant Swan had actual knowledge that Mr. Miller was not breathing in his cell, but proceeded to delay immediate emergency medical treatment through placing another inmate in a cell before evaluating Mr. Miller. Defendant Swan also delayed treatment by calling for a

Code 6 Signal 1 rather than a Dr. Heart; thereby delaying emergency medical treatment for Mr. Miller by three minutes.

300.    The Defendants' denial of medical care and delay of emergency medical treatment deprived Mr. Miller of his basic human need of medical care and allowed Mr. Miller to suffer extreme pain, cessation of breathing, respiratory collapse, eventual cardiac arrest; and ultimately caused the death of Mr. Miller.

301.    The Defendants further acted with evil motive or intent and/or reckless and callous indifference to Mr. Miller's Fourteenth Amendment rights, entitling Plaintiff to punitive damages.

302.    Plaintiff's requests for relief are set forth below.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Wrongful Death)
### (As to all Defendants)

303.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

304.    The Defendants' previously established violations of Mr. Miller's constitutional rights led to Mr. Miller's respiratory collapse, and cardiac arrest.

305.    The Individual Defendant's constitutional violations more likely than not led to Mr. Miller's death due to respiratory collapse.

306.    Plaintiff's requests for relief are set forth below.

### DEMAND FOR JURY TRIAL

307.    Plaintiff demands a jury trial on all matters raised in this Complaint.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A.  A declaration that the practices complained of herein are unlawful and unconstitutional violations of the Mr. Miller's rights under U.S. Const. Amend. XIV and 42 U.S.C. § 12102;

B.  Awarding Plaintiff their reasonable and necessary attorneys' fees and expenses which Plaintiff has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1983;

C.  Awarding Plaintiff punitive damages due to the Individual Defendants' conduct done with evil motive or intent and/or reckless and callous indifference to Mr. Miller's Fourteenth Amendment rights;

D.  Awarding Plaintiff, as the representative of the Estate of Mr. Miller, survival damages for conscious pain and mental anguish prior to Mr. Miller's Death, funeral and burial expenses, and exemplary damages;

E.  Awarding Plaintiff, as wrongful death beneficiary of Mr. Miller, damages for mental anguish, loss of companionship and society, and pecuniary loss;

F.  Awarding Plaintiff such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Plaintiff further demands that she be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Respectfully submitted,

*/s/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
J. Sebastian Van Coevorden
Texas State Bar No. 24036522
svancoevorden@equalrights.law
**ELLWANGER HENDERSON LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile:  (469) 998-6775

***COUNSEL FOR PLAINTIFF***